PEOPLE v. BAYER.

1. Criminal Law—Burden of Proof—Innocence.
   The defendant in a criminal case does not have the burden of proving his innocence.

2. Vendor and Purchaser—Title to Deposit—Acceptance of Offer.
   The would-be purchaser of real estate retains title to the good-faith deposit until his offer to purchase is accepted.

3. Same—Part Performance of Land Contract—Specific Performance—Insolvency.
   A purchaser of real property, upon acceptance of his offer, became a party to a binding executory contract which he had partially performed and which he could have, in the absence of insolvency proceeding, sought and received specific performance.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 20 Am Jur, Evidence § 149.
[2] 55 Am Jur, Vendor and Purchaser § 529 *et seq.*
[3] 49 Am Jur, Specific Performance § 92 *et seq.*
[4] 55 Am Jur, Vendor and Purchaser § 15.
[5] 53 Am Jur, Trover and Conversion § 8.
[6] 53 Am Jur, Trover and Conversion §§ 30, 163.

4. Same—Deposit—Bailment—Escrow.

 The owner of real estate who accepts an offer to purchase it and receives a deposit thereon is not the bailee or escrow agent of the purchaser of the deposit after an executory land contract has been executed.

5. Trover and Conversion—Money.

 There can be no conversion of money unless there is an obligation on the part of the defendant to deliver specific money to plaintiff.

6. Criminal Law—Larceny by Conversion—Evidence.

 Defendant, agent of partnership which had a house for sale and who accepted deposit therefor and entered into an executory contract with complaining witness for the property, was not guilty, as a matter of law, of larceny by conversion of the funds of the complaining witness, since the title to the funds had passed from the complaining witness to the partnership (CL 1948, § 750.362).

 Smith, Black, and Voelker, JJ., dissenting.

Appeal from Recorder's Court for the City of Detroit; Krause (Paul E.), J. Submitted January 16, 1958. (Docket No. 61, Calendar No. 47,404.) Decided June 11, 1958.

Ben Bayer was convicted of larceny by conversion. Reversed.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Samuel H. Olsen,* Prosecuting Attorney, *Samuel Brezner* and *Steven G. Danielson,* Assistant Prosecuting Attorneys, for the people.

*Rottman & Siegel* (*Meyer Weisenfeld,* of counsel), for defendant.

Voelker, J. *(dissenting).* Defendant was tried below on a 2-count information charging him with (1) obtaining $3,500 from Eugene Gottlieb on March

16, 1954 upon the false pretense that a house located in Oak Park, Michigan was free and clear of all encumbrances and (2) larceny by conversion from Gottlieb of the same amount on the same date, as presently more particularly set forth. The case was tried by the court without a jury. The defendant was acquitted under the first count and convicted under the second and sentenced to serve 2 to 5 years in Jackson prison for larceny by conversion. His motion for a new trial was denied. Upon leave granted he has appealed here.

The charging portion of the information relating to the offense for which the defendant was convicted reads as follows:

"That Ben Bayer, late of the said city of Detroit, in said county, heretofore, to-wit, on the 16th day of March, A. D., 1954, at the said city of Detroit, in the county aforesaid, Three Thousand Five Hundred Dollars in lawful money of the United States of America, and of the value of $3,500 of the personal property, goods, and chattels of Eugene Gottlieb was delivered to and came into the possession of Ben Bayer, and afterwards and while the said goods and chattels then in his possession as aforesaid, he, the said Ben Bayer, to-wit, on the 16th day of March, A. D., 1954, at the city of Detroit aforesaid, the said property of the value aforesaid, feloniously and fraudulently did embezzle and convert to his own use; Wherefore, the said Ben Bayer, the property of the said Eugene Gottlieb, aforementioned, in manner and form aforesaid, feloniously did steal, take and carry away."

Aside from a few crucial ones, most of the facts are not in dispute. One Sunday in the spring of 1954 the complainant Eugene Gottlieb and his wife were driving in Oak Park and saw a nearly completed home which they examined, liked, and became interested in buying. At the trial complainant Gott-

lieb testified and defendant disputed that on that same day he phoned and discussed terms with defendant and arrived at a tentative selling figure of $19,000 plus taxes, the dispute being solely over the time of such conversation, not that it took place. It is undisputed that the legal title to the property was recorded in the name of the defendant and his wife Eva; that the new house thereon was being built and sold by the Bayer-Winston Building Company, a copartnership, of which the defendant's wife Eva was one of the 2 partners, one Jack Winston being the other; and that the defendant was not a partner in this enterprise although he worked for it. It is also undisputed that the Gottliebs thereafter gave one Rosen a check for $500 as a deposit on the house, which check was made payable to defendant Ben Bayer, and was later indorsed and cashed by him, nothing appearing on said check to indicate that it was ever deposited to the credit of the partnership.

It is also undisputed that on the Saturday before the alleged date of this offense (Tuesday, March 16, 1954), the defendant appeared at the Gottlieb home in Detroit with a printed form of agreement of sale of the house, the blanks of which were already filled in and dated (March 13, 1954) and signed by him, as hereafter noted. Defendant then said he wanted an additional $3,500 to apply on the purchase of the house. Gottlieb said he wanted further time to consult an attorney (which he did the next day, Sunday) and, as Gottlieb testified, on Tuesday, March 16, 1954, the defendant returned to the Gottlieb home and made a brief addition to the agreement in his own handwriting to the effect that the deposit money would be returned if Gottlieb could not get a $7,000 mortgage, as suggested by Gottlieb on the interim advice of his attorney.

On this occasion Mr. Gottlieb observed that the "offer-and-acceptance" agreement of sale prepared

by Bayer designated the seller as the "Bayer-Winston Bldg. Co." under which was signed: "By Ben Bayer, Ptnr." Some discussion thereupon arose as to whom the additional check should be made out, and defendant told the Gottliebs that he was a partner, it should be made out to him. This was accordingly done and Mrs. Gottlieb's check for $3,500 was thereupon delivered by Gottlieb to the defendant. The record shows that this check was thereafter indorsed by Ben Bayer and cashed by him, nothing appearing on this check to indicate that it was ever deposited to the credit of the partnership. Both checks were people's exhibits at the trial. At his trial defendant made no motion for a continuance because of the absence or unavailability of any defense witnesses.

It is further undisputed that when the agreement was signed by the Gottliebs and the second check was delivered by Gottlieb to Ben Bayer for $3,500, there was a mortgage on the property for $12,000. There was proof of other liens against the property aggregating, along with the mortgage, upwards of $18,000. Defendant disputes the amount and validity of some of the liens but not of the mortgage. It is undisputed that the defendant was then aware of the existence of these encumbrances, defendant and his wife being parties to the mortgage. At the trial Gottlieb testified that prior to signing the agreement and delivering the check on March 16, 1954, he asked defendant whether there were any mortgages or other liens on the property and that defendant said there were none. At the trial defendant denied this and said the subject was not discussed and that he felt no compulsion to raise the subject because the presence of such liens was common practice on houses under construction and he fully expected that all liens would be paid off and discharged before the transaction was closed.

It is further undisputed that thereafter the complainant Gottlieb learned through his attorney that there was a mortgage and other liens against the property; that Gottlieb thereupon immediately communicated this knowledge to defendant, who, while not denying the liens, said they would be taken care of and for the Gottliebs not to worry, he would have the house for them in 30 days. A few days later Gottlieb was informed during a phone call from Jack Winston (one of the partners in the Bayer-Winston Building Company) that Bayer had no right to sell the house and that the partnership was going into receivership. This occurred some 3 weeks after March 16, 1954. Gottlieb immediately communicated this information to Bayer and told him he wanted his $4,000 back. Gottlieb testified that to this Bayer replied: "Sorry, I don't have it, go ahead and sue me." At his trial Bayer did not deny having this conversation or making this statement.

Numbered paragraph 8 of the agreement relating to the purchase of the house, and signed by Bayer and the Gottliebs, acknowledged receipt of the $4,000 paid by the Gottliebs to Bayer as follows: "The undersigned seller is hereby authorized to present this offer to the purchaser and to pay to the seller or obtain his receipt for, the deposit money hereby tendered in the amount of $4,000 which is to be credited on the purchase price if the sale is completed." Paragraph 9 provides that the purchaser's offer "is irrevocable for —— days from the date hereof, and if it is not accepted by the seller within that time, the deposit shall be returned forthwith to the purchaser." The portion signed by Bayer as a partner of Bayer-Winston Building Company is designated in the margin as an "Acceptance of Offer" and reads, in part, as follows: "The foregoing offer is hereby accepted and the seller agrees to sell said premises upon the terms stated."

On April 8, 1954, the Bayer-Winston Building Company was by circuit court action placed in receivership, upon petition of Jack Winston, one of the 2 partners. The Gottliebs filed no claim in the receivership proceedings nor did they get the house or ever get their money back from Ben Bayer or anyone.

At the trial Jack Winston testified for the prosecution that he and Eva Bayer (defendant's wife) were the 2 partners constituting the Bayer-Winston Building Company; that Ben Bayer was not a partner; that the partnership built the house in question; that the legal title of.this and other residential properties in the vicinity being built by it was carried in the names of Ben and Eva Bayer; that he knew that there was a $12,000 mortgage and other liens on the premises; that Ben Bayer worked with him for the partnership in an undefined capacity in the sale and construction of houses.

On cross-examination the following passage occurred:

"*Q.* When any properties were sold  *  *  *  the profits went into the partnership?
"*A.* Up to this sale, yes."

On redirect examination he was shown the 2 checks cashed by Bayer and testified that he had never seen them before; that he handled a good portion of the books and financial records of the partnership; that this was the only outstanding unreturned deposit that was not that of the partnership; and that he never saw the $3,500 or any part of it.

Ben Bayer was the only witness who testified for the defense. Contrary to Gottlieb's testimony he testified that he first talked with the Gottliebs about the house during a phone conversation the day before he appeared at their home with the filled-in agreement of sale already dated and signed by him

a few days before March 16, 1954, and that this was the first time he saw them. (This would make the first phone conversation on the disputed date of Friday, March 12th and the first meeting on the undisputed date of Saturday, March 13th.) Bayer testified that during this initial phone conversation he and his wife and the Gottliebs for the first time arrived at the selling price; that he first heard of their possible interest in the house through a telegram from his brother-in-law, Sam Rosen (who also worked for the partnership), while he, Bayer, was in Florida; that Rosen then informed him that the Gottliebs had given him a deposit check for $500; that he, Bayer, prepared and filled in the agreement of sale in his own handwriting; that the agreement was finally executed and check delivered not on Tuesday, March 16, 1954, as alleged by the prosecution and testified by Gottlieb, but on the following Sunday, 5 days later (which would make it March 21st); and that the Gottliebs signed the agreement and delivered the check in his presence in his home, not 5 days earlier in their own home as Gottlieb had testified.

Bayer testified that there was no discussion between him and Gottlieb as to whether there were any encumbrances on the property, more than Gottlieb's noted desire to apply to a bank for a $7,000 mortgage to help pay for the house; that at no time did he represent the property as being free and clear of all liens; that he knew when he accepted the $3,500 check that there was a mortgage and certain other liens on the property; that he did not discuss them because he fully expected to take care of these encumbrances before the deal was closed; that the presence of such liens and the discharge of them out of the sale price was common practice in the trade; and that the only reason the deal didn't go through was because of the receivership, which tied up all the

funds in his hands. On this score on direct examination he was asked, referring to the receivership: "You have been restricted by the circuit court from using those funds in your possession?" to which the defendant answered, "That is right."

When asked why he signed the agreement in the name of the copartnership he answered, "That is our usual practice." He testified that while he knew the house was not in the name of the partnership, this and all other houses being built by it were held in trust for it. The following passage then occurs:

"*Q.* You cashed 2 checks, exhibits 2 and 3?

"*A.* Yes.

"*Q.* You had those checks issued in your own name?

"*A.* Yes.

"*Q.* You got the money?

"*A.* Yes.

"*Q.* You knew it was a good-faith deposit and you could not mix that with any other funds?

"*A.* No.

"*Q.* You knew the house was not sold until all the agreements were made, that you could not dispose of the money until all agreements were made?

"*A.* Until all the liens were paid off?

"*Q.* Yes.

"*A.* That is right."

And again:

"*The Court:* You didn't use any of the $4,000 in this building?

"*A.* Partly.

"*The Court:* How much?

"*A.* About $100.

"*The Court:* $3,900 went in other stuff?

"*A.* From this Bayer-Winston program."

This exchange concluded Bayer's testimony at the trial.

The appellant urges that his conviction is a vio-

lation of due process and constitutes imprisonment for debt; that it is against the great weight of the evidence; and that "where there is an offer and acceptance for the purchase of a residential dwelling and a deposit thereunder is given to the owner, and the owner fails to return the deposit after demand based upon insolvency" this cannot ever constitute the crime of larceny by conversion.

In support of his position appellant urges that it was the receivership proceedings alone that prevented him from consummating the transaction; that there was no legal obligation upon him to return the money; that the Gottliebs had their contractual right to pay the full amount and demand a deed; that at most all the Gottliebs had was a possible action for specific performance or a claim against the receivership, neither of which remedies they chose to pursue.

On his point that the conviction was against the great weight of the evidence the appellant urges that since he was charged with larceny by conversion on March 16, 1954, the day he got the $3,500, and that since manifestly he could not have been guilty of any offense on that day because, while denying any conversion, no demand was made upon him for its return until some 3 weeks later, that therefore defendant lawfully received the money and there could be no conversion prior to demand, which was later.

He further urges that no intent to commit the crime was established by any testimony; that the acquittal of the defendant below on the other count (false pretenses) eliminated any consideration of how or by what authority defendant received the money or could accept the Gottlieb offer; and that the same acquittal likewise eliminated all consideration of any of the testimony of Jack Winston; that acquittal on the one count further blocked consideration of all testimony on how he got the money and

presupposes that he got it properly and then improperly converted it, which latter was not shown, and certainly not on the date alleged; and that such acquittal further eliminated all consideration of any question concerning defendant's right to accept the offer of purchase, of any representations he then may have made, and of any claim that the funds of Gottlieb were wrongfully obtained; that the prosecution failed to show that defendant had profited personally; and, finally, that to sustain a conviction here would have "a very unjust and unwise effect upon business."

\*    \*    \*

We find it a sobering responsibility to have to embark upon a consideration of this case with the knowledge that any affirmance by us of the conviction of Ben Bayer will further contribute to our current business woes. Thus forewarned we shall tread carefully.

That the testimony in this case may have richly shown that this defendant possessed "a heart full of larceny," as the saying goes, or that he may possibly have been guilty of some other offense, is no reason to sustain his conviction for this offense unless it is warranted by the record. On the other hand, that he may in the same transaction have possibly been guilty of one or more different criminal offenses as well as the one for which he was convicted is no reason to let him go.

The statute under which defendant was convicted (CL 1948, § 750.362 [Stat Ann 1954 Rev § 28.594]) provides as follows:

"Any person to whom any money, goods or other property, which may be the subject of larceny, shall have been delivered, who shall embezzle or fraudulently convert to his own use, or shall secrete with the intent to embezzle, or fraudulently use such goods, money or other property, or any part thereof,

shall be deemed by so doing to have committed the crime of larceny and shall be punished as provided in the first section of this chapter."

Cases construing this statute are found at 3 Gillespie, Michigan Criminal Law and Procedure (2d ed), § 1809. We quote the following from page 2150:

"The crime has two elements, one, delivery of property, and, two, its embezzlement, fraudulent conversion or concealment. The character of the delivery, whether induced by legal or wrongful means, is not an element. The gist of the offense is the conversion. (Citing authority.)

"Where, on a prosecution for larceny by conversion, a justifiable inference arises that the accused converted money of the complaining witness to other uses than that for which it was supplied him, with a fraudulent intent, the crime is made out, and the subsequent relations of the parties, claimed to establish the relation of debtor and creditor, cannot change the fact, though they may rebut the inference of guilt." (Citing authority.)

While the people in a prosecution for larceny by conversion are not required either by the statute or our decided cases to show as an element of the offense that illegal means were used to acquire possession of the property allegedly embezzled, concealed or converted—money in this case,—we do not think this means that the methods actually used in acquiring possession must be ignored in considering whether an unlawful conversion took place. In criminal cases, as in other areas of life, the old saying "Actions speak louder than words" is often as true as it is trite, and to the extent that criminal intent must be shown we think the entire transaction must and should be examined; this as much for the sake of a possibly innocent defendant as for the prosecution.

In this case it is undenied that an employee of a

partnership held himself out to the Gottliebs as a partner contrary to the facts; that while so masquerading he purported to enter into a formal written agreement accepting Gottlieb's money and his offer to buy the house; that while he knew that Gottlieb had to raise $7,000 on the property to complete the deal, he said nothing (to charitably accept for the moment his own version) about the heavy encumbrances and liens already existing thereon; that while still so posing and representing himself as a partner he procured the Gottliebs to draw and deliver over to him in his individual name their check for $3,500; that, once in possession and now dropping his imposture, he indorsed and cashed that check in his own name; and that the proceeds were thereafter never again seen either by the Gottliebs or (and only this in the foregoing resume is disputed by Bayer) by the partnership.

We think that defendant's argument that his acquittal on the false pretenses count bars any consideration of how or by what means he got possession of the money, as in turn bearing on whether he converted it, is in these circumstances entirely without merit. This is tantamount to saying that a prosecution for various possible offenses growing out of a single transaction contained in a plural count information are conducted at the people's peril that an acquittal on any count would not automatically prevent conviction on any others, however meritorious. Put another way, this would mean that to be convicted on any count such a defendant must perforce be convicted on all. He cites no applicable cases to sustain his position and we find none.

Perhaps we can test his argument by supposing that this defendant had been tried consecutively under 2 separate informations, the first charging solely the matter in the first count (false pretenses), upon which he was acquitted; the second charging the

substance of the second count (larceny by conversion), for which he was convicted. Would the acquittal in the first prosecution bar either the admissibility or consideration of prior testimony properly bearing, as earlier indicated, upon guilt or innocence under the second information? We think not. We do not say that acquittal on one charge may never thus bar certain prior testimony necessary to conviction on another; we say that it does not do so in this case. We further note that no question is raised as to the sufficiency of that portion of the information under which this defendant was convicted, nor was any motion made below relative to claimed misjoinder or to compel an election. Moreover in this case we think there was no misjoinder.

The subject is interesting and we pursue it. We think certain of defendant's basic legal assumptions here are faulty. His syllogism appears to run something like this: To constitute a larcenous conversion the people must show that possession of the property was obtained by the converter by false pretenses; the alleged converter here was acquitted of obtaining this precise property by false pretenses; therefore his conviction for the larcenous conversion thereof cannot stand because 1 of the 2 essential elements of the offense is fatally missing. (He also elsewhere denies any conversion, of which more later.) In the first place this is simply not the law; to convict for larcenous conversion, possession of the property *may* but need not necessarily have been obtained by false pretenses or other "skulduggery." (*People* v. *Franz,* 321 Mich 379.) And even if the contrary were true, the false pretenses with which this particular defendant was charged and acquitted (that the residential property was free and clear of all encumbrances) was not the only false pretense practiced by him on Gottlieb in this transaction. Indeed, for some reason that escapes us he was never charged

(and therefore never acquitted) with the most obvious and glaring (and perhaps the most easily provable) false pretense of all: his false representation and holding out that he was a partner in the Bayer-Winston Building Company. For him to insist that a possession so acquired—conceived in sin, so to speak—must be totally ignored by the triers of the facts in determining whether any conversion by him may thereafter have taken place, is as unrealistic as it is clearly not the law.

Equally without merit is his argument that because he had no obligation to return the money (as he argues), therefore there could be no conversion. Whether he had any obligation to return the money we shall touch upon presently; whether he diverted that money from the purposes for which it was delivered to him constitutes the heart of this case. On this score we have the testimony of the partner Winston that he handled the books and never saw the Gottlieb checks or any of the proceeds. The essence of the offense under these circumstances was the appropriation of Gottlieb's money by Bayer to his own purposes, good or bad, and not to the avowed purposes for which it had been paid, namely, to apply on the purchase of this particular house from the partnership. Even Bayer concedes this failure in his unsupported testimony (opposed by Winston's) that he used but $100 on this house and used the rest on the partnership's "program" (also contradicted by Winston's testimony). In fact he even contradicted his own testimony on this score when he also testified at his trial that he was restrained by a circuit court order in the partnership receivership from using these funds in his possession. One wonders how Gottlieb's funds could still have been in Bayer's possession to be restrained if he had already devoted them to the Bayer-Winston "program." Or does he mean that he put them into the program *after* the

receivership? Then shouldn't the receiver have
known something about that? And would he not
then have been lying to Gottlieb when he expressed
sorrow and told him he didn't have the money and
to sue *him*—and all this clearly *before* any receiver-
ship?

The defendant argues at length that the people
failed to show any criminal intent to commit the
crime for which he was convicted. With equal fervor
he urges that his conviction was contrary to the great
weight of the evidence. Since he was the only de-
fense witness who testified, and it accordingly must
be his own testimony which, partly at least, he claims
so clearly outweighs that of the people, it may not
be inappropriate for us to continue to scrutinize in
some detail that testimony and also some of its im-
plications and omissions, which we now proceed to
do.

We find that the defendant's testimony, sketchy
and brief as it was on some of the crucial issues,
is in its omissions as well as in what it did say, not
without certain significant contradictions and incon-
sistencies. First he failed to deny Gottlieb's testi-
mony that he told him *before* any receivership,
"Sorry, I don't have it, go ahead and sue me." Then,
apparently to bolster his implicit argument that
only the receivership prevented him from either re-
paying Gottlieb or discharging the liens and closing
the house deal, he sought in his testimony (as he
still does here) to blame the receivership for tying
up the funds *in his possession.* Then, apparently to
bolster his other main argument that anyway there
was no conversion, he blandly and inconsistently as-
serted (as he still asserts here) that he had devoted
the money to the partnership "program." There
are still other inconsistencies and omissions.

We are aware that it is not up to Bayer to prove
his innocence, but rather for the people to prove his

guilt beyond a reasonable doubt. But if the defendant claims, as he earnestly does, that he did not convert this money to his own use but instead applied it to the purposes for which it was paid, we think in the light of the people's evidence to the contrary that it was up to him, if he chose, to offer more than his unsupported assertion. He made and makes no claim of the unavailability of necessary witnesses. Yet the receiver did not testify. Rosen did not testify. Bayer's wife, one of the partners, did not testify. Manifestly the people could not in this case compel her to testify against her husband. It would seem strange, however, if the defendant's claims of rectitude and fair dealing were true, that his wife, the only other partner, should not have known something about the "program" and, also, where the the money went. In fact it would be stranger still if she didn't. In any event this leaves Bayer in rather a poor position to dispute that Winston spoke authoritatively for the partnership or to complain that the people's proofs were insufficient and clearly outweighed. While it is not up to the defendant to prove his innocence, neither is it up to the people to prove his innocence, and especially is this so where the proofs available to the prosecution point steadily toward guilt. It is not up to the prosecution to needlessly pile up testimonial proof of guilt. As we recently said in *People* v. *Allen,* 351 Mich 535, 549:

"While the defendant charged with crime clearly never has to prove his innocence, there is manifestly a point in the trial of a case where if he is dissatisfied with the proofs made by the people on a given point, he can fairly be expected—at least before he will be heard to complain—to make some sort of rebuttal move in his own behalf. Most of the things complained of here under this ground of claimed error were more properly possible matter in rebuttal."

Pursuing this thought further, it would seem that defendant could have at least called his wife to bolster his version of his testimonial dispute at the trial with Gottlieb (now abandoned in his brief, of which more presently) that it was the night before he delivered the sales agreement (as he claims) and not much earlier (as Gottlieb testified) that they first discussed terms over the phone and arrived at a selling figure. This is so because at the trial Bayer flatly and at some length contradicted Gottlieb on this score and testified that both he *and his wife* first discussed and arrived at a selling price with Gottlieb the night before he first saw Gottlieb and delivered the sales agreement already filled in and signed by him as a partner. She could at the very least have testified to the *fact* of that conversation and thus possibly have shaken Gottlieb's testimony on this and other issues. Nor was the mysterious and elusive Rosen heard from on this and other matters, such as his alleged telegram to Bayer in Florida or how Bayer's name happened to appear on the first $500 check. (We have already noted that defendant sought no continuance because of missing witnesses.) Unimportant as these matters may be in determining whether a larcenous conversion took place, they do assume some relevance on the rather important issue of who was telling the truth at the trial. Again it would seem unlikely that a man even as naively and resolutely trusting as Gottlieb would have delivered a $500 deposit check to a man called Rosen and made out to Ben Bayer unless he had some rather definite notion who this Ben Bayer was, what apparent interest or authority he possessed, and how much the house he planned to buy was going to cost.

There are still other significant inconsistencies. We observe that defendant's statement of facts in his brief before us now without fanfare wholly accepts Gottlieb's testimony at the trial that the agree-

ment was finally signed and the second check paid on March 16, 1954, which was a Tuesday. This curiously backhand concession of defendant's error concerning previous sworn testimony given by him so elaborately and at length at his trial (that the agreement and check deal was actually closed 5 days later at his home, which would make it Sunday, March 21, 1954) sets us wondering. Bayer and his present attorneys may now want to forget this testimony, but we find ourselves unable to do so. We keep wondering why Bayer should have so testified in the first place. Why tell such a sharply divergent story and then later seek to abandon it? Why should he now want to retreat from his earlier story? Did he at his trial entertain some notion that it would be advantageous to him to get the date he got the money closer to the time of the April receivership, to which he now ascribes so much of his woes? Or to possibly make Gottlieb out a liar? Or thus to permit making a later legal argument that there was a fatal variance between the people's allegation and proof of time? Or all of these things and more? If so then why should he give up so easily on his detailed trial story and now in this Court quietly seek to accept poor fumbling Gottlieb's version of the time? Was it because the check was plainly dated March 16, 1954 (a Tuesday), and that Bayer or someone has since concluded that it would be too much to expect anyone to swallow gladly the notion that the fleeced "eager beaver," Gottlieb, who was so anxious to close this deal that he sought out his own attorney on a Sunday (March 14, 1954), would then proceed to date and make out a $3,500 check the following Tuesday, March 16, 1954 (and this before Ben Bayer could on his story have possibly told Gottlieb, as none deny, that it was *when* the deal was closed that it was first determined that the payee still to be named in the check should be Ben Bayer and not

the partnership), and then hold that signed and dated but presumably payee-less check and the agreement for 5 more days until the following Sunday? Again all this may be relatively or even entirely unimportant on the issue of larcenous conversion, but once again significant on the issue of who was telling the truth in this case.   We also observe that at the trial Bayer's then attorney on cross-examination did not ask Winston *one single question* about his important and damaging testimony that the partnership never saw the Gottlieb checks or any of the proceeds.   Or to cross-examine him on the equally important subject that it was "our usual practice" (as Bayer later testified) for Bayer to hold himself out and sign sales agreements as a partner and accept, cash and keep the proceeds of property payments.   These seem strange omissions indeed in the light of Bayer's subsequent testimonial claim and his argument before us that he devoted *all* of the proceeds of the Gottlieb checks either to the house or to the partnership "program."

Defendant's assertion that but for the receivership he could "very easily" have discharged the liens and delivered the property to Gottlieb is borne out neither by the proofs nor by the general situation, which we need not review.   This is also to argue "good intentions" as a defense to a conversion already accomplished, if it ever took place at all.   The receivership had nothing to do with that and there is no proof in this record, more than Bayer's bare assertion, that *he* was ever enjoined by anyone from paying out the money.   One wonders how he can in one breath argue that he devoted Gottlieb's money to the partnership "program" and in the next solemnly declare and ascribe his woes to the fact that *he* was enjoined from paying out the money in *his* possession.   The possible likelihood that, despite all his masquerading and evasive shenanigans, had he re-

turned the money or caused delivery of the house, there might not have been any criminal prosecution for his conversion is no defense to such a prosecution when brought. The fact is that he did neither.

Defendant's companion argument that Gottlieb should have risked putting good money after bad and completed the deal or have filed a claim against the receivership is equally unrealistic and without merit. Gottlieb was naive and foolish enough as it was, heaven knows, but perhaps only the veriest dunce would have gone ahead with the deal after Gottlieb learned what he learned, the dismal details of which we need not review. We also wonder how Bayer expected "very easily" to discharge the encumbrances and close the deal with Gottlieb when to do so he knew all along that Gottlieb would have to get a $7,000 mortgage loan on a $19,000 house upon which there was, as Bayer knew, already a large mortgage and other liens totalling upwards of $18,000. And especially so—taking his own story—when, for but $100, he had devoted Gottlieb's money to some vague and unexplained "program" and not to the encumbered property.

What Gottlieb did or did not do after he paid the money to Bayer also need not concern us more than as it may tend to prove the guilt or innocence of Bayer of any conversion. Gottlieb's failure to pursue any possible civil courses open to him cannot help Bayer. The sole question is whether Bayer under these circumstances committed the crime against the people for which he has been tried and convicted. And for a defendant in these circumstances to argue that the victim of a larcenous conversion should have filed a claim against the receivership of a partnership that did not get the money (the only basis for any valid claim against the receivership) because of that same defendant's wrongful actions in failing to pay it over to the partner-

ship is an irony of such bold proportions that to state it is to answer it. Especially when that same defendant also testified in effect that he was enjoined from using the money in *his* possession to repay Gottlieb or to discharge the liens. In any case, Gottlieb was trying to buy a home, not a lawsuit, and we do not understand that criminal liability in this State depends upon the absence or presence or exhaustion of any real or imagined civil remedies. (See *People* v. *Cole,* 349 Mich 175, 181, 182, 188.)

Defendant seems to labor under the fixed but mistaken notion that because on a few crucial issues (he either admitted or failed to deny most of the people's testimony) he disputed the testimony offered by the people—for example, his laconic version of what he did do with the money—his version must be accepted below and here as the only possibly true version. Winston's testimony appears demonstrably true in some particulars—thus when he testified he never saw the Gottlieb checks, for the rather simple reason that Bayer had instead indorsed and cashed the checks at a bank, all of which (when confronted in court with the people's exhibits of the actual checks bearing his unadorned indorsement) Bayer was obliged to admit. In the face of this are we to say out of hand that the trier of the facts below was wrong in choosing to believe Winston rather than Bayer? We think not.

Bayer also significantly did not deny making the callously cynical "Sorry, I don't have it, go ahead and sue me" answer that the finally disillusioned and fearful Gottlieb testified he got from Bayer when he ultimately confronted him with the true state of affairs and wanted his money back. Was the trial court compelled to believe that this terse and cryptic answer was that which a guiltless man would likely have made under these circumstances? And if he had, as at his trial he vaguely claimed,

anonymously devoted the money to the "program" of a tottering building partnership for which he merely worked (assuming arguendo that that would have excused him) why should he ever have invited Gottlieb or anyone to sue *him* for that money? Or was he still deluded that he was a partner and really meant that the "program" to which he had devoted the money was himself?

"Sorry, I don't have it, go ahead and sue me." This beguiling phrase fairly beckons for analysis. Remember—this was said to Gottlieb by Bayer *before* the receivership, and it might be profitable to examine it a little in the light of the defendant's story—or stories—told at the trial and his present position here. Our curiosity is aroused by the defendant's studied avoidance of this phrase in the argument in his brief. Especially since it might conceivably be argued by him that what he meant by it was that he didn't have the money because he had already devoted it to the partnership "program." Then one reflects and wonders why, in such an event, Bayer should have been "sorry" and have apologized to Gottlieb for doing precisely what he now says should free him? And why, if he *had* done so, should he have invited Gottlieb to sue *him* for what he didn't have? And again why, if he had done so, should he have testified at his trial that the circuit court in the receivership (which came later) prevented him from doing anything with the *funds in his possession?* Would not the trier of the facts be almost driven by this undenied phrase, weighed in the full evidentiary context, to conclude that the trapped and desperate man, confronted by the disillusioned Gottlieb, at last caught up with by the truth, was really saying: "Sorry, I don't have it [because I embezzled and converted it], go ahead and sue me"? Shorn of all its legal and verbal adornments, defendant's argument resolves itself to something like this:

"I had Gottlieb's money all along but I was forbidden to use it—and anyway I didn't have the money because I had used it—so I naturally invited Gottlieb to sue me for the money I had but didn't have."

As noted, the agreement provided that the money paid by Gottlieb to Bayer was deposit money to be credited on the purchase price if the sale was completed. It also provided that if the offer was not timely accepted by the seller "the deposit shall be forthwith returned to the purchaser." Viewed one possible way, if the purported "acceptance" by Bayer for the partnership was unauthorized, then there was no valid acceptance by him for the partnership and never could have been and the conversion was complete. Even under the agreement the money should thus have been returned forthwith. If, as Bayer claims and Gottlieb trustingly thought, the purported "acceptance" by him for the seller partnership was authorized and constituted a binding contract to purchase the house, then the money should have gone to the partnership to apply on this house. Bayer did neither. He failed to return the checks or deliver them to the partnership. Instead he cashed the checks in his own name and applied the money (at least $3,900 of it according to his own admission) to purposes other than the purchase of *this* property. Gottlieb was not paying his money to build or pay for some *other* house or for somebody's general building "program." Nothing in the agreement or in the actions or conversation of the parties lends the slightest support to any such notion.

Defendant's complaint about the time of the offense as alleged by the people is without merit. Under the circumstances of this case time was not of the essence of the offense charged. See CL 1948, § 767.45 (Stat Ann 1954 Rev § 28.985) and CL 1948, § 767.51 (Stat Ann 1954 Rev § 28.991) and *People* v.

*Ignofo,* 315 Mich 626, 630. Moreover this question was not timely raised below so as to permit possible amendment and cannot thus be urged on this appeal. We have already indicated that a conversion could have taken place the day the money passed. In any case we think any question on that score was cured by the verdict. The opening sentence of the following quotation from the *Franz Case* is further authority for our position.

What we said in *People* v. *Franz,* 321 Mich 379, commencing on p 385, applies with equal force to many of the contentions made by the defendant in this case:

"By the testimony the issue was presented whether at any time, as charged in the information, defendant, instead of buying the iron for delivery to Wallace with the money paid by him to defendant, the latter did fraudulently convert it to his own use. In *People* v. *Doe, alias Meyer,* 264 Mich 475, 481, we said:

" 'The offense is neither common-law larceny nor embezzlement, but is one of the crimes provided by statute law to occupy the no-man's land surrounding the offenses against property at common law. * * *

" 'The crime has two elements, (1) delivery of property, and (2) its embezzlement, fraudulent conversion or concealment. The *character* of the delivery, whether induced by legal or wrongful means, is not an element. The gist of the offense is the conversion.'

"In defendant's letter of October 10, 1946, to Wallace, defendant refers to money paid to him in these words: 'Our records show *you have deposited with us* sufficient funds to cover 10 tons of this material.' In testifying defendant admitted receiving $4,080 from Wallace, thus leaving for consideration and determination by the jury the other element of the offense charged—*i.e.,* embezzlement by defendant or his fraudulent conversion to his own use of money paid to him by Wallace. On this phase of the case

clearly an issue of fact was presented for the jury.
Defendant admitted receiving $4,080. Of this
amount he testified he paid $1,800 to the Asher Com-
pany; and he also testified it 'has cost me around
$1,500 to locate a sufficient quantity of steel to make
the deliveries.  *  *  *  Not this particular steel,
but steel for Mr. Wallace and other people.' These
2 items total $3,300. The question at once arises:
What disposition did defendant make of the balance
of the $4,080 received from Wallace? Obviously this
'balance of $780 has been by defendant converted to
his own use in some manner. As to this phase of the
case it is not a defense, as suggested in defendant's
brief, that after receiving the money from Wallace
defendant made an honest effort to purchase the ma-
terial for Wallace. If thereafter defendant em-
bezzled or fraudulently converted to his own use any
money paid him by Wallace, defendant committed
the offense charged.

"But defendant further contends:

" 'There was no felonious intent. The facts con-
clusively show that when respondent received the
payment he intended to procure and deliver the mer-
chandise, and actually endeavored to do so. With-
out felonious intent, there can be no larceny by con-
version.'

"From the testimony, in part hereinbefore quoted,
it plainly appears that defendant is not justified in
saying 'the facts conclusively show that when re-
spondent received the payment he intended to pro-
cure and deliver the merchandise.' Instead, in this
respect, an issue of fact was presented.  *  *  *  Not-
withstanding defendant's testimony in his own be-
half, his credibility as well as the issue of his intent,
under this record, were matters for jury determina-
tion."

Under this statute the people may, but need not,
prove what the defendant did with the converted
property; it is enough that they show (1) that he
gained possession of the property and (2) failed to

apply it to the purpose for which it was delivered to him. Once these things are shown it will be assumed that any such failure or diversion from *that* purpose is a conversion to his own use. Any other rule would effectually thwart and frustrate many prosecutions for this offense and in effect amount to a judicial repeal. It was precisely the sort of conduct we find here that the statute was designed to discourage and punish.

As we said in the *Franz Case, supra,* whether the money was or was not devoted to the purpose intended is, where disputed, a question for the trier of the facts to decide. To this we would add: so too, where disputed, is the determination of the purpose itself. Winston's testimony indicates that Bayer had not treated the money for the purpose for which it was delivered to him by Gottlieb. Bayer claimed otherwise—which really amounts to a dispute over the purpose. However old the refrain, it is still true that the determination of issues of disputed fact can normally best be made by those who saw and heard those who testified to them. Thus which witness was telling the truth here was for the trier of the facts to decide, and not for us to determine upon review of a cold record. More than determining that there was competent evidence to support the verdict, we are restricted to a review of claimed errors of law. We find such competent evidence in this record and we further find no errors warranting any reversal.

In the last analysis Bayer's principal argument resolves itself into one that he is somehow guiltless of conversion *because* he misused the money. We refer to his blunt, unsupported and totally unexplained (and also disputed) testimony that he put $100 on the house and the rest on the partnership "program." That he may have done "good" with all or part of the misused money is no defense. If A gives B $4,000 to apply on a house and he instead puts $100

on it and gives the rest to the Salvation Army or plays it on the ponies, or both, is this any the less a conversion? We say no.

The motion for a new trial was properly denied and the conviction should be affirmed.

SMITH and BLACK, JJ., concurred with VOELKER, J.

EDWARDS, J. The defendant was tried before a judge in Detroit recorder's court on an information containing 2 counts: (1) obtaining money by false pretenses, and (2) larceny by conversion. Jury trial had been waived. On April 5, 1955, defendant was found guilty of the latter offense and sentenced to 2 to 5 years in Jackson prison. The trial court subsequently denied his motion for new trial.

The defendant's wife and one Winston were partners in a concern known as the Bayer-Winston Building Company in which he likewise was active. Bayer-Winston built a house with the use of partnership funds upon a lot to which defendant and his wife had legal title.

Complaining witness Gottlieb saw the house and, after negotiations with defendant, signed an offer and proposed agreement to purchase in the total sum of $19,000, on March 13, 1954.

Relevant clauses of the proposed agreement provided for:

(1) "The delivery of the usual warranty deed conveying a marketable title;"

(2) "If mortgage for $7,000 is not obtainable, purchaser is to have return of his deposit;"

(3) "Any existing encumbrances upon the premises which the seller is required to remove under this offer may be paid and discharged with the purchase money at the time of the consummation of the sale, or if the purchaser elects, assumed with abatement of the purchase price;"

(4) "The undersigned seller is hereby authorized to present this offer to the purchaser and to pay to the seller or obtain his receipt for, the deposit money hereby tendered in the amount of $4,000 which is to be credited on the purchase price if the same is completed."

Other clauses call for return of the deposit in the event seller did not accept the agreement, or in the event he was unable to clear title.

The agreement was accepted by Bayer-Winston by the signature of Ben Bayer described as "partner." The purchaser paid $4,000 in 2 separate checks.

The purchaser sought the advice of counsel in preparing to close the deal and was advised by his lawyer that there were substantial liens on file against the premises. The purchaser, who was the complaining witness at this trial, testified that Bayer had represented to him that the house was free and clear of encumbrances. This, Bayer denied.

It appears from the record that Bayer-Winston company was in financial difficulty and when the complaining witness informed Bayer of this discovery he was told "Don't worry, we will take care of it." He testified further that after a call from Winston he called Bayer back in a few days and asked for his $4,000 back, telling him that he understood the partnership was going into receivership and that the deal could not go through. Bayer at that time, he said, told him "Sorry I don't have it, go ahead and sue me."

The petition for receivership was filed after the preliminary agreement was signed by Gottlieb and Bayer. The record is clear that this house was listed as a partnership asset in the insolvency proceedings, and that the complaining witness and purchaser did not file a claim therein.

The question as to what happened to the $4,000 is dealt with in the record currently before us in these 2 bits of testimony:

The following is from defendant's testimony:

*"The Court:* You didn't use any of the $4,000 in this building?

*"A.* Partly.

*"The Court:* How much?

*"A.* About $100.

*"The Court:* $3,900 went in other stuff?

*"A.* From this Bayer-Winston program."

On this same subject, Jack Winston testified:

*"Q.* Did you have money in the property of this particular piece of property which was, — the title of which was in Ben Bayer and Eva Bayer?

*"A.* Yes, I had money in the partnership.   *   *   *

*"The Court:* Who handled the financial books and records?

*"A.* I kept a good portion.

*"The Court:* Did you handle the money?

*"A.* We both handled it,—no, Mrs. Bayer brought in the money in the form of deposit slips.

*"The Court:* You handled the books?

*"A.* I did a good deal of it.

*"The Court*: You never saw the $3,500 or any part of it?

*"A.* No, sir."

At trial the complaining witness was allowed, over strenuous objection, to testify orally that the $4,000 paid by him was tendered as a "good faith" deposit. This term was not employed in the written sales agreement.

Two other facts are relevant to decision of this case. It should be noted that at no point did the partnership disavow Bayer's action as its agent in executing the preliminary sales agreement. Finally, the prosecution attempted no rebuttal to Bayer's testimony that the funds received from the complain-

ing witness were all applied to partnership matters.

It is not, of course, defendant's responsibility to prove his innocence. What the trial court may have suspected, or what we may suspect, about defendant's motives in this transaction cannot substitute for evidence which the prosecution is required to present to prove defendant's guilt beyond a reasonable doubt. To the writer, it seems plain that this transaction had most of the normal incidents of an ordinary real-estate deal up to the point of insolvency proceedings on the part of the Bayer-Winston partnership. Defendant was not charged with larceny by conversion of funds belonging to the partnership. He was charged with larceny by conversion of the funds of complaining witness Gottlieb. So long as Gottlieb's offer to purchase stood unaccepted, the money transferred by him to Bayer could indeed have been regarded as a good-faith deposit to which Gottlieb retained title.

When, however, the sales agreement was accepted, and the acceptance conveyed to Gottlieb, the complaining witness was then a party to a binding executory contract which he had partially performed and as to which he could have, in the absence of the insolvency proceeding, sought and received specific performance. *Todd* v. *Ratz,* 313 Mich 111; *Rathbun* v. *Herche,* 323 Mich 160; *Brin* v. *Spruance,* 348 Mich 29.

It would be a new rule of law for us to hold the seller of a piece of real estate as bailee or escrow agent for funds paid to him by the purchaser after a binding contract for sale had been executed.

This case might stand on entirely different grounds if the prosecution had presented evidence from which the trial judge could have found that Bayer, in executing this agreement, acted without partnership authority. No such proof may be found

in this record.   On the contrary, Jack Winston testified:

"*Q.* Did Ben Bayer work in connection with that partnership?
"*A.* Yes.
"*Q.* As a salesman?
"*A.* The duties of Ben Bayer and myself were never clearly defined; we work in the sale and construction.     *     *     *
"*Q.* You sold some of the houses yourself?
"*A.* Yes.
"*Q.* And Ben Bayer sold some?
"*A.* Yes."

The people rely, in relation to this conviction, upon *People* v. *Franz*, 321 Mich 379, in which case a prospective buyer of galvanized iron gave defendant $4,080 to buy the iron.   In the *Franz Case* there was no written contract, and apparently the Court interpreted the agreement of the parties as retaining title to the funds in the prospective purchaser.

More applicable to our present case is the holding of this Court in a civil action alleging tortious conversion of funds:

"It should be noted that defendant was not required to deliver to plaintiff the specific or identical moneys which he collected for merchandise sold or on accounts receivable, but was only required to pay plaintiff the invoiced price for merchandise delivered to him.   Therefore, as plaintiff was not entitled to the specific or identical moneys collected by defendant from his customers, he was not entitled to a judgment in tort for conversion.     *     *     *
" 'There can be     *     *     *     no conversion of money, unless there was an obligation on the part of defendant to deliver specific money to plaintiff.'   65 CJ, Trover and Conversion, § 24, p 23."   *Garras* v. *Bekiares,* 315 Mich 141, 147, 148.

In the writer's view of the instant case, title to the $4,000 paid by the complaining witness passed to the Bayer-Winston partnership with acceptance of the preliminary agreement. As a consequence, defendant could not convert from Gottlieb that to which he no longer had title. As to whether defendant's actions represent larceny by conversion of partnership assets, or fraudulent diversion of funds due to be accounted for in insolvency proceedings, we neither discuss nor decide since adequate facts are not before us and no such charges were the subject of this trial. As a matter of law, the defendant on this record was not guilty of the offense of larceny by conversion with which he was charged.

Reversed. Sentence vacated.

DETHMERS, C. J., and CARR and KELLY, JJ., concurred with EDWARDS, J.

KAVANAGH, J., took no part in the decision of this case.