PEOPLE v MASON

Docket No. 219630. Submitted November 14, 2000, at Detroit. Decided July 27, 2001, at 9:00 A.M.

William J. Mason was bound over to the Wayne Circuit Court on one count of larceny by conversion in each of five cases. The defendant moved to quash the criminal informations, claiming that under the facts of each case he could not be guilty of conversion. The court, Deborah A. Thomas, J., granted the motions, finding that, although the defendant might be subject to civil liability for failing to refund the money the complainants gave him as down payments for the purchase of mobile homes, which purchases were never completed, he was not criminally liable for larceny by conversion because the complainants had given him possession and title to the money. The prosecution appealed from the orders dismissing the charge of larceny by conversion in each case.

The Court of Appeals *held*:

1. Larceny by conversion occurs when a person obtains possession of another's property with lawful intent, but subsequently converts the other's property to the person's own use.

2. Each complainant in these cases intended to retain legal title to the down payment money, though not possession of it, until each complainant received the home each sought to purchase. The original owner of the money needed only to entrust the defendant with the money expecting that the same amount would be returned in case the transaction failed in order to retain legal title to the money though relinquishing possession. It is not necessary to prove that the complainants required the defendant to keep the money separate from his personal accounts in order to infer that they intended to retain title to the money until and unless each received the home each had arranged to buy.

3. The evidence presented at the preliminary examinations supports a finding of probable case to believe that the essential elements of the crime of larceny by conversion were shown with regard to each case. The circuit court erred in quashing the informations. The orders quashing the informations must be reversed and the matter must be remanded for further proceedings.

Reversed and remanded.

1. CONVERSION — LARCENY BY CONVERSION — ELEMENTS.

  Larceny by conversion occurs when a person obtains possession of another's property with lawful intent, but subsequently converts the other's property to the person's own use; the crime of larceny by conversion is comprised of the following essential elements: the property at issue must have some value; the property must have belonged to someone other than the defendant; someone must have delivered the property to the defendant, irrespective of whether that delivery was by legal or illegal means; the defendant must have embezzled, converted to the defendant's own use, or hid the property with the intent to embezzle or fraudulently use it; and at the time the property was embezzled, converted, or hidden, the defendant must have intended to defraud or cheat the owner permanently of that property (MCL 750.362).

2. CONVERSION — ONE'S OWN PROPERTY.

  A person cannot convert the person's own property so as to violate the statute prohibiting larceny by conversion (MCL 750.362).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief of Research, Training, and Appeals, and *James M. Surowiec*, Assistant Prosecuting Attorney, for the people.

*Matthew M. Evans*, for the defendant.

Before: COLLINS, P.J., and JANSEN and WHITBECK, JJ.

PER CURIAM. The prosecutor appeals as of right orders dismissing the charge of larceny by conversion[1] in each of five separate cases against defendant William John Mason. We reverse and remand.

---

[1] MCL 750.362.

I. BASIC FACTS AND PROCEDURAL HISTORY

A. INTRODUCTION

With few exceptions, the material facts of each of the five cases consolidated in this appeal are identical. However, because in each case the prosecutor has an independent obligation to demonstrate that there is probable cause to believe a crime has been committed and Mason committed it,[2] we address the facts of these cases separately. We take the facts of these cases from the testimony at the respective preliminary examinations, mindful that Mason has not been proved guilty beyond a reasonable doubt of any crime.

B. CASE NO. 98-011756

In December 1997, Wilma Bryant met Mason at Mason Homes in Taylor, Michigan, to inquire about buying a used mobile home. Bryant looked at available units, including a 1989 Patriot model that Mason was selling on behalf of its owners. Bryant believed that she and the owners, to whom Mason allegedly communicated her offer, agreed that she would pay $13,000 for the mobile home. On February 19, 1998, Bryant made an annuity check for $12,000 payable to Mason Homes. She signed a contract with Mason Homes to purchase the 1989 Patriot. Later, Bryant paid an additional $1,825 by check for the purchase. Mason subsequently endorsed the checks as president of Mason Homes and negotiated them.

_____

[2] *People v Baugh*, 243 Mich App 1, 5; 620 NW2d 653 (2000).

Bryant could not take delivery of the mobile home until her lot was ready, so she paid Mason $50 a month to store the home on the Mason Homes property. In June 1998, Bryant went to Mason Homes to arrange for delivery of the 1989 Patriot only to discover that the doors to the business had been padlocked and the business was no longer in operation. Bryant never received the mobile home and Mason never refunded her $13,825. At the preliminary examination, Sharon Neumann, one of the individuals selling the 1989 Patriot to Bryant, stated that Mason never told her that he had sold the mobile home and that he never gave her any money for it. On July 22, 1998, Neumann independently sold the mobile home to another purchaser.

### C. CASE NO. 98-013004

On March 9, 1998, Donald Fritz and Mason signed a contract for Fritz to purchase a mobile home from Mason Homes. Fritz paid $4,400 toward his purchase in the form of money orders made out to Mason Homes. When added to the $200 Fritz had already paid on October 14, 1997, as a partial down payment and the additional $400 he paid on May 7, 1998, Fritz gave Mason Homes a total of $5,000. Fritz understood that this substantial down payment was a condition of obtaining the financing Mason agreed to help him obtain to purchase the mobile home. Mason immediately endorsed the money orders as president of Mason Homes and deposited the $4,400 into his personal bank account at Comerica Bank rather than one of his two business accounts there. Fritz later attempted to contact Mason regarding his mobile home, only to learn that Mason Homes has closed.

Fritz received neither the mobile home nor a refund of the $5,000 he had paid for it.

On April 7, 1998, Sue Hill, her husband, and Mason signed a contract with Mason Homes to purchase a mobile home. Mason said he would arrange for financing for the couple to buy the home and they had been approved for a loan. Hill then paid $5,350 as a deposit for the mobile home, but informed Mason that she could not take delivery immediately. That same day, a check for $5,350 was deposited into Mason's personal bank account. In June 1998, Hill returned to Mason Homes to finalize her purchase, but found that Mason Homes had closed. She never received a refund or the mobile home.

On October 29, 1997, William Augugliaro went to Mason Homes in Taylor and signed a purchase agreement to buy a new mobile home for $44,525. Mason agreed to sell the home Augugliaro already owned before Augugliaro bought the new unit. Augugliaro wrote a check for $5,000 to Mason Homes as a down payment for the new mobile home. Mason endorsed the check as president of Mason Homes and, on October 30, 1997, it was deposited into his personal bank account at Comerica Bank. In August 1998, Augugliaro sold his house to a purchaser Mason found for him, but Augugliaro never received his new mobile home. Mason never refunded his down payment.

F. CASE NO. 99-000700

On February 28, 1998, Margaret Rocha went to Mason Homes in Taylor. She and Mason discussed her interest in purchasing a mobile home. Rocha signed a contract with Mason Homes that day. She gave Mason $900 in cash and a check for $100 made out to Mason Homes for the $1,000 down payment. The $100 check was deposited into Mason's personal bank account at Comerica Bank on March 2, 1998. Rocha had informed Mason that she could not buy a new mobile home until she sold her house, which occurred on June 4, 1998. Rocha then tried to contact Mason about fulfilling the mobile home order, but could not get in touch with him. Rocha never received a refund.

### G. THE MOTIONS TO QUASH

In March 1999, after the district court conducted the preliminary examination in each case and bound Mason over on one count of larceny by conversion in each case, Mason moved in the circuit court to quash each of the five criminal informations. Mason argued that he could not be guilty of larceny by conversion because there was no evidence that he agreed to deliver specific money to the complainants. Nor, he argued, was there any evidence that he promised to segregate the funds and apply them only to the purchase price of the homes. Because the complainants only expected to receive a mobile home and never expected to receive any money, Mason contended that they each surrendered possession and title to their down payments to Mason. Essentially, Mason claimed that because the money was his, he could not be guilty of conversion.

The prosecutor countered that, because Mason deposited the complainants' money into his personal bank account while doing nothing to procure their mobile homes as he had promised, he converted their money to his own use. Moreover, the prosecutor argued, because Mason was acting as an agent to purchase the mobile homes, the complainants transferred possession, but not title, to the money. Consequently, according to the prosecutor, the money did not belong to Mason and he was guilty of converting it to his own use.

The circuit court granted Mason's motions to quash, dismissing all five cases, reasoning that Mason might be subject to civil liability for failing to refund the complainant's money, but that he was not criminally liable for larceny by conversion. In particular, the circuit court found it significant, evidently,[3] that none of the contracts between Mason and the complainants required the down payments to be placed in escrow or delivered to a vendor. The circuit court reasoned that, because the money was not earmarked for a particular purpose in the contract, Mason's action in depositing the money into his personal bank account was not criminal conversion because each of the complainants had given him possession and title to the money used for the down payments.

## II. STANDARD OF REVIEW

This Court reviews "a circuit court's decision to grant or deny a motion to quash a felony information

---

[3] Not every record includes a copy of the contract the complainant signed. The copies that are available suggest that this contract is a standard form.

de novo to determine if the district court abused its discretion in ordering bindover."[4]

### III. BINDOVER

The Legislature has established the legal standard a district court magistrate must follow in order to bind over a defendant for trial following a preliminary examination:

> If it shall appear to the magistrate at the conclusion of the preliminary examination that a felony has been committed and there is probable cause for charging the defendant therewith, the magistrate shall forthwith bind the defendant to appear before the circuit court of such county, or other court having jurisdiction of the cause, for trial.[5]

This probable cause standard of proof is less than proof beyond a reasonable doubt.[6] Nevertheless, in finding probable cause to believe that a crime was committed and that the defendant committed the crime, the district court "must always find that there is 'evidence regarding each element of the crime charged or evidence from which the elements may be inferred' in order to bind over a defendant."[7] Consequently, it is critical to know the elements of a crime when determining whether the district court abused its discretion in finding sufficient evidence to bind over a defendant.

The larceny by conversion statute provides:

---

[4] *People v Northey*, 231 Mich App 568, 574; 591 NW2d 227 (1998).

[5] MCL 766.13; see also MCR 6.110(E).

[6] *People v Hudson*, 241 Mich App 268, 278; 615 NW2d 784 (2000).

[7] *Id.*, quoting *People v Selwa*, 214 Mich App 451, 457; 543 NW2d 321 (1995).

> Any person to whom any money, goods or other property, which may be the subject of larceny, shall have been delivered, who shall embezzle or fraudulently convert to his own use, or shall secrete with the intent to embezzle, or fraudulently use such goods, money or other property, or any part thereof, shall be deemed by so doing to have committed the crime of larceny . . . .[8]

An early panel of this Court in *People v Scott*[9] identified the essential elements of larceny by conversion: (1) the property at issue must have " 'some value,' "[10] (2) the property belonged to someone other than the defendant, (3) someone delivered the property to the defendant, irrespective of whether that delivery was by legal or illegal means, (4) the defendant embezzled, converted to his own use, or hid the property " 'with the intent to embezzle or fraudulently use' " it, and (5) at the time the property was embezzled, converted, or hidden, the defendant " 'intended to defraud or cheat the owner permanently of that property.' " Stated more simply, larceny by conversion occurs "where a person obtains possession of another's property with lawful intent, but subsequently converts the other's property to his own use."[11]

---

[8]   MCL 750.362.

[9]   *People v Scott*, 72 Mich App 16, 19; 248 NW2d 693 (1976), quoting 5 Mich Proposed Cr Jury Instructions 1047 (1975).

[10]   The prosecutor charged Mason with larceny by conversion "over $100." Though *Scott* requires proof that the property has value, the plain language of MCL 750.362 does not require proof that the value exceeds $100. Evidently, the prosecutor mistakenly added this dollar value to the larceny by conversion charge in the criminal information because a similar larceny statute, 1957 PA 69, MCL 750.356, previously used a $100 threshold. See 1998 PA 311.

[11]   *People v Christenson*, 412 Mich 81, 86; 312 NW2d 618 (1981).

The testimony at each preliminary examination clearly provides probable cause to believe that the property at issue had value and each complainant gave the property to Mason. This satisfied the first and third elements. However, as we explain in more detail later, the critical issue in this appeal revolves around the fundamental proposition that " 'a person can[not] "convert" his own property.' "[12] This principle directly affects the proof of the second element. This proof of title ownership is also critical to the fourth and fifth elements because Mason's fraudulent intent must exist at the time he converted the property.[13] Thus, only if the complainants retained title to this money after they gave it to Mason can he be guilty of converting their property.

### IV. LEGAL TITLE

Fortunately, case law resolves whether Mason obtained title to the down payment money as soon as each complainant gave him possession of it. In *People v O'Shea*,[14] the complainant, Sharon Gardner, went to an upholstery store to choose fabric with which to recover chairs she owned.[15] After the defendant, a store employee, went to her home to measure the chairs, she wrote a check for $125 to the business.[16]

---

[12] See *Foremost Ins Co v Allstate Ins Co*, 439 Mich 378, 391; 486 NW2d 600 (1992), quoting with approval *Foremost Ins Co v Allstate Ins Co*, 185 Mich App 119, 122; 460 NW2d 242 (1990); see also *Christenson, supra* at 87 ("As with common-law larceny, larceny by conversion is a crime against possession and not against title; one cannot convert his own funds.").

[13] See *People v Artman*, 218 Mich App 236, 241; 553 NW2d 673 (1996).

[14] *People v O'Shea*, 149 Mich App 268; 385 NW2d 768 (1986).

[15] *Id.* at 270.

[16] *Id.*

When, over the course of several telephone calls, the defendant told her that it would take additional time to obtain the fabric and another person at the business told Gardner that the fabric was unavailable but that she would have to wait for a refund, Gardner became suspicious.[17] As in this case, Gardner learned that the upholstery store had closed without fulfilling her order or refunding her money.[18] A police investigation revealed that the defendant had, in fact, deposited Gardner's check into the store's bank account, but that account had thereafter been closed.[19] A jury subsequently convicted the defendant of larceny by conversion.[20] On appeal, the defendant in *O'Shea* argued that he could not be guilty of the crime because Gardner did not retain title to the check once she gave it to him.[21] The *O'Shea* Court rejected this argument, affirming the conviction.[22]

The *O'Shea* Court spent significant time distinguishing the facts of the case under consideration from the facts of cases in which the Supreme Court reversed a criminal conviction for larceny by conversion.[23] We gather from the *O'Shea* Court's emphasis on the facts of the case before it as well as the facts of the contrary cases that we must look at the facts surrounding each complainant's transfer of money to Mason to determine whether they each intended to retain title to the money. As in *O'Shea*, we think it plain under

---

[17]  *Id.* at 270-271.

[18]  *Id.* at 271.

[19]  *Id.* at 271-272.

[20]  *Id.* at 269.

[21]  *Id.* at 272.

[22]  *Id.* at 274.

[23]  See *Christenson, supra; People v Bayer*, 352 Mich 564; 90 NW2d 656 (1958).

the circumstances of the five cases being appealed, including the contracts for sale, that each complainant intended to retain legal title to the down payment money, though not possession of it, until each complainant received the home each sought to purchase. It would make little sense for each of these complainants to intend to give their hard-earned money to Mason to keep irrespective of whether they ever received the home for which they bargained, especially with no contractual provision to that effect. In fact, the only forfeiture provisions relating to the down payments in these contracts referred to circumstances in which the purchaser (i.e., each complainant) failed to complete the sale by securing the full purchase price or financing. The contracts did not excuse Mason from refunding the down payment if, for some reason, the home being purchased was not available before delivery. Read as a cohesive whole, each contract contemplated an exchange of goods (the home being purchased) and services (Mason's assistance as a dealer in completing that transaction) for each complainant's money. Without a completed transaction, or any negotiation for a purchase-sale in certain instances, Mason can hardly claim that he was entitled to keep even a portion of the money each complainant gave him, especially in the absence of any contractual language to that effect.

As did the *O'Shea* Court, we also think that the result in *People v Christenson*,[24] the primary case Mason contends supports dismissal of the charges, does not control the outcome of this case. There is a critical difference between *Christenson* and this case.

---

[24] *Christenson, supra.*

In *Christenson,* the homeowners who made progress
payments to the defendant did so because the defen-
dant had, in fact, made progress on the construction
project and, therefore, was entitled to this partial pay-
ment.[25] That the individuals who paid him expected
the defendant to use these progress payments to pay
certain debts incurred in the construction project was
irrelevant. Under the circumstances of the case,
though the defendant was still obligated to pay these
other debts, the *Christenson* Court concluded that
the individuals making the progress payments did not
intend to retain title to the money when they gave it
to the defendant.[26] To the contrary, nothing from the
record indicates that the complainants in this case
intended to transfer title to Mason.

The Supreme Court in *Christenson,* adopting lan-
guage from *People v Bayer*[27] to describe the circum-
stances under which a court may infer that a money
transfer included a transfer of legal title, explained
that it was reversing the defendant's conviction
because the homeowners and the defendant did not
have an agreement concerning *"specific* funds."[28] In
other words, had the defendant agreed to take the
money the homeowners gave him only to pay the
debts at issue, then he would have been guilty of lar-
ceny by conversion because he would have had pos-
session of the money only for the purpose of giving it
to these creditors, but used it for other purposes. The
defendant, though in actual possession of the money,
never would have obtained legal title to the money

---

[25] See *id.* at 87-88.

[26] *Id.* at 88.

[27] *Id.* at 89, quoting *Bayer, supra* at 595.

[28] *Christenson, supra* at 89.

under those facts because he could not do with it as he wished, a limitation that generally does not exist for title owners of property.[29]

When the *O'Shea* Court revisited this "specific or identical moneys" concept first outlined in *Bayer* and then continued in *Christenson,* it concluded that the term could not be interpreted so narrowly that it would preclude virtually any prosecution under MCL 750.362.[30] Acknowledging the fungible nature of money, *O'Shea* clarified that "[t]he 'specific money' language in *Christenson* and *Bayer* should be read to mean the specific amount of money to make it identifiable as opposed to the identical money."[31] In other words, the money's original owner need not intend to have the actual bills, coins, or negotiable instrument returned in case the transaction, regardless of its nature, fails. Rather, the money's original owner need only entrust the defendant with the money expecting that the same amount be returned in case the transaction fails in order to retain legal title to the money though relinquishing possession.

Under this interpretation, Mason's argument that each complainant did not expect his or her specific money to be returned did not legally exempt him from prosecution under MCL 750.362. Fritz may not have expected his original money orders and checks to be returned to him, but he certainly wanted $5,000 refunded. Bryant may not have cared whether she ever again had physical possession of the annuity

---

[29] See, generally, *Bott v Natural Resources Comm,* 415 Mich 45, 80-82; 327 NW2d 838 (1982); *Butcher v Detroit,* 131 Mich App 698, 706; 347 NW2d 702 (1984).

[30] *O'Shea, supra* at 275.

[31] *Id.*

check she endorsed to Mason Homes, but the record leaves no serious question of fact concerning whether she expected a refund in the amount of that annuity check in addition to the other money she had already paid when she could not obtain the mobile home she attempted to buy with that down payment. The same holds true for each of the other complainants.

We believe that each complainant's expectations concerning the title to the money were clear. Therefore, Mason's argument that he did not have a contractual obligation to keep their money in a separate business account to prevent commingling the down payments with his personal assets makes no difference to the outcome in this case. Though the Michigan Supreme Court in *Christenson* commented that the defendant did not have a duty to segregate the funds at issue,[32] this observation must be viewed in context. The facts in *Christenson* suggested that the homeowners did not otherwise intend to keep title to the money when they gave it to the defendant as progress payments. The Supreme Court in *Christenson* was searching for any reason that would suggest that the homeowners had dedicated that money for a "specific" use, thereby preventing the defendant from obtaining legal title to it. One way the homeowners could have imposed this limitation on the way the defendant used the money would have been to require him to put the money into a trust account separate from his personal assets. However, because the homeowners and the defendant agreed neither that the defendant would use the progress payments only to satisfy the particular debts at issue nor that

---

[32] *Christenson, supra* at 90.

he would keep the money for that purpose in a special account, the Supreme Court was compelled to reverse the defendant's conviction. In these cases, as the foregoing analysis indicates, it is not necessary to have proof that the complainants required Mason to keep the money separate from his personal accounts in order to infer that they intended to retain title to the money until and unless they received the home they each arranged to buy.

### V. CONCLUSION

The evidence adduced at the preliminary examinations presents probable cause to believe that (1) the property at issue had value because it was money, (2) the money did not belong to Mason, (3) each complainant delivered the money to Mason, (4) Mason fraudulently converted the money to his own use when he deposited it into his personal bank account without completing the mobile home sale for each complainant, and (5) Mason intended to deprive the complainants of their money permanently when he ceased operating Mason Homes without refunding the money to them. Because the district court did not abuse its discretion by binding over Mason for trial on larceny by conversion charges in these cases in light of these facts and inferences, the circuit court erred in quashing the informations.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.