*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CHRISTOPHER ROBERT CLINTON,

Defendant-Appellant.

UNPUBLISHED
August 17, 2023

No. 361702
Macomb Circuit Court
LC No. 2019-001812-FH

Before: O'BRIEN, P.J., and CAVANAGH and MARKEY, JJ.

PER CURIAM.

Defendant appeals as of right his bench-trial conviction of larceny by conversion of property with a value of $1,000 or more but less than $20,000, MCL 750.362; MCL 750.356(3)(a). We affirm.

## I. BACKGROUND

The complainant, Ben Clowers, contracted with defendant to install an air-conditioning unit, a furnace, ductwork, and gas and water lines for a residential property that Clowers owned. The estimate for the project was $8,550, and Clowers paid a $5,500 deposit. Clowers alleged that defendant never delivered the equipment or performed any of the agreed-upon work, and failed to return the deposit.

The trial court held a bench trial on January 12, 2022, and February 23, 2022. Clowers testified that he and defendant agreed that the work would begin on August 27, 2018, and conclude on August 29, 2018. Despite Clowers and defendant exchanging frequent messages and telephone calls, the first activity on the project was not until August 29, 2018, when defendant and his employee installed an older air-conditioning unit in the building. Clowers testified that defendant's employee was at the site on August 30, 2018, but sat in his vehicle and in the building, and did not have any equipment. Clowers stated that defendant's assistant returned on August 31, 2018, and did not perform any of the contracted work. Clowers testified that, on September 1, 2018, defendant and his employee used a trenching machine to begin a trench for the water and gas lines, but had to stop because of inclement weather that collapsed some of the trench. Clowers continued that defendant's employee resumed work on the trench the next day, but had to stop

when he broke the building's drain tile. He then began a second trench in an area that did not need a trench and broke the main sewer pipe.

Clowers testified that he contacted defendant on September 3, 2018, and directed him to cancel the project because of damage to the property, defendant not showing up to work, and a lack of honesty. Along with canceling the project, Clowers demanded either a refund or the equipment that should have been purchased with the deposit. Clowers testified that defendant stated that he would attempt to redeem the project, but Clowers was no longer interested.

Clowers testified that defendant arrived at the site on September 4, 2023, without the deposit or equipment. Clowers' two brothers and mother were present when defendant arrived. Clowers stated that defendant promised to obtain and deliver the purchased equipment. Clowers testified that his foot was broken at the time, so one of his brothers offered to drive with defendant to pick up the equipment. Clowers stated that he was suspicious and followed them in his own vehicle. Clowers testified that instead of going to get the equipment, defendant drove to a police station, where both Clowers and defendant filed reports. Clowers testified that before leaving the police station, defendant told him that he would return to finish the job. Clowers stated that defendant arrived with the police the next day and collected his trenching machine, and promised to return to reimburse Clowers.

Clowers and defendant communicated on September 7, 2018, with defendant promising to bring the furnace and air conditioner, and again on September 10, with defendant promising to have the furnace delivered and installed. Clowers testified that defendant never delivered or installed a furnace, air-conditioning package, ductwork supply and return with registers, or any portion of his deposit money. Clowers stated that defendant returned to him only two pieces of ductwork and two plastic lines. About two weeks later, Clowers accessed the email link for the estimate and discovered defendant had added $6,000 to the original estimate. Clowers stated that the new estimates were for digging a trench for the electrician, replacing the main sewer, adding a water or gas line, and a 30-gallon power vent water heater, that were not a part of the original agreement. Clowers denied that he agreed to add any services to the original plan and asserted that defendant had never mentioned waiting for other services to be completed before he could work.

Defendant testified that he had been in the heating and cooling business for 20 years, and that he contracted with Clowers on August 26, 2018, to install a furnace, air conditioner, ductwork, and gas piping in Clowers' building. Defendant testified that he had a "vague conversation" with Clowers as to when the project would be completed. Defendant testified that he was ready to begin work immediately, but Clowers' builder had not sufficiently prepared the interior of the building. Defendant asserted that he informed Clowers that he could not proceed without the walls in place, and discussed a building plan with Clowers. Defendant stated that Clowers agreed to amend the contract to include a deeper dig with more expensive equipment so that defendant could add water piping, a water heater, and a main sewer to the gas piping. According to defendant, Clowers also wished for him to dig a trench for the electrical. Defendant stated that the contract price increased from $8,500 to $17,000. Defendant also referred a plumber to Clowers.

Defendant testified that he did not begin work on the project until August 29, 2018, because of complications with his other projects. On that date, defendant and his employee installed a temporary heating and cooling unit for the construction. Defendant also testified that he and his

employee spent an entire Saturday on the job in order to complete digging trenches for utilities. Defendant testified that Clowers asked him how much the job was going to cost (including the work of the plumber, electrician and builder) and defendant replied that it could be up to $50,000 to $100,000. Defendant testified that when Clowers heard this, his attitude changed and "everything kind of just went south." Defendant testified that Clowers informed him on September 3, 2018, that his employee had damaged a sewer pipe that the employee was supposed to remove, and that Clowers wished to cancel the job. Defendant stated that he instructed his employee to put the pipe back together, and told Clowers that he would return to the site on September 4, 2018, to fix any issues. Defendant testified that he arrived on the site on September 4, 2018, where Clowers struck him with a crutch, and Clowers' family yelled at him to return the money, so he went to the police. He stated that the police assisted him in recovering the excavator and his other property. Defendant stated that he provided $6,800 of work in a temporary heating and cooling system, digging and installing support boards for the trench, gas and water piping and ductwork supplies on the site, building plans, and four days of his employee's labor. Defendant stated that, because he believed that Clowers owed him $1,000, he did not return the $5,500 down payment to Clowers.

The trial court issued an opinion and order on March 17, 2022, stating that the evidence established that Clowers' deposit was to be used to purchase a furnace, air-conditioning package, ductwork supply and return with registers, and a gas line. However, Clowers did not receive this equipment or a refund of his deposit. The trial court stated that while defendant claimed that the deposit was used for other expenses, no evidence was presented that Clowers agreed to those expenses, and no evidence was presented that defendant could use the deposit money as he pleased for purposes other than what was on the original estimate. Further, the trial court found that the text messages exchanged between Clowers and defendant indicated that Clowers continued to ask defendant why he was not showing up to work and defendant repeatedly indicated that he would be there. The trial court stated that defendant also promised Clowers that he would deliver the equipment, but he never did. The trial court concluded:

> the deposit provided to Defendant had value, Mr. Clowers intended to retain title to the money until he was at least provided with the equipment, and that Defendant converted and intended to convert the money for his own use by failing to deliver the equipment or return the deposit despite his text messages stating that the equipment would be delivered.

The trial court found that the prosecution had met its burden and that defendant was guilty.

Defendant now appeals.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the prosecution failed to present sufficient evidence to support his conviction for larceny by conversion. We disagree.

This Court generally reviews de novo a challenge to the sufficiency of the evidence. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). However, a trial court's findings of fact in a bench trial are reviewed for clear error. *People v Gistover*, 189 Mich App 44, 46; 472 NW2d 27 (1991), citing MCR 2.613(C). "A finding is clearly erroneous if, after a review of the

entire record, the appellate court is left with a definite and firm conviction that a mistake has been made." *Gistover*, 189 Mich App at 46.

Due process requires that evidence of every element of a crime be proved beyond a reasonable doubt in order to sustain a criminal conviction. *People v Hampton*, 407 Mich 354, 366; 285 NW2d 284 (1979), citing *In re Winship*, 397 US 358, 364; 90 S Ct 1068; 25 L Ed 2d 368 (1970). When reviewing a challenge to the sufficiency of the evidence, the evidence is viewed in the light most favorable to the prosecution, and this Court must consider whether, based on that evidence, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013). Direct and circumstantial evidence, as well as all reasonable inferences that may be drawn from it, are considered to determine whether the evidence was sufficient to sustain the defendant's conviction. *People v Hardiman*, 466 Mich 417, 429; 646 NW2d 158 (2002).

As noted, defendant was convicted of larceny by conversion of property with a value of $1,000 or more but less than $20,000. MCL 750.362. In order to convict defendant of larceny by conversion, the prosecution was obligated to prove the following:

> (1) the property at issue must have some value [in this case, at least $1,000], (2) the property belonged to someone other than the defendant, (3) someone delivered the property to the defendant, irrespective of whether that delivery was by legal or illegal means, (4) the defendant embezzled, converted to his own use, or hid the property with the intent to embezzle or fraudulently use it, and (5) at the time the property was embezzled, converted, or hidden, the defendant intended to defraud or cheat the owner permanently of that property. [*People v Mason*, 247 Mich App 64, 72; 634 NW2d 382 (2001) (quotation marks omitted).]

"[L]arceny by conversion occurs 'where a person obtains possession of another's property with lawful intent, but subsequently converts the other's property to his own use.' " *Id.*, quoting *People v Christenson,* 412 Mich 81, 86; 312 NW2d 618 (1981).

On appeal, defendant challenges only the trial court's finding that he intended to convert the deposit money for his own use. He contends that there was insufficient evidence to support this finding—and that, as a result, his due process rights were violated—because he used the money that Clowers gave him to cover expenses incurred on the project. In support of this argument, defendant directs this Court's attention to *Christenson*, where our Supreme Court held that a defendant who accepted partial payments for "work in place" could not be held liable for conversion after he failed to use the money to pay the workers responsible for that work. *Christenson,* 412 Mich at 89-90. *Christenson* explained that "there was no agreement that defendant apply the specific funds he received from complainants for particular work to pay the laborers and materialmen responsible for that work," and because "[t]here can be . . . no conversion of money, unless there was an obligation on the part of defendant to deliver specific money to plaintiff," no conversion occurred. *Id.* at 89-90 (quotation marks and citation omitted). Based on *Christenson*, defendant argues that there was insufficient evidence to support that he intended to convert Clowers' money because

Mr. Clowers did not request contract language requiring that "specific funds" be dedicated to "particular work." Nor did the contract include the requirement of a trust account. Certainly, there can be no doubt that title to the payment passed to Mr. Clinton who used Mr. Clowers' money to cover the expenses he incurred for the job and to purchase materials for the job, like the excavator that was used by Mr. Clinton to dig the trenches (and obviously by someone else later to fill in the trenches).

Defendant's argument ignores this Court's explanation of *Christenson* in *Mason*, 247 Mich App at 76-77:

> The Supreme Court in *Christenson*, adopting language from *People v Bayer*, 352 Mich 564; 90 NW2d 656 (1958)] to describe the circumstances under which a court may infer that a money transfer included a transfer of legal title, explained that it was reversing the defendant's conviction because the homeowners and the defendant did not have an agreement concerning "specific funds." In other words, had the defendant agreed to take the money the homeowners gave him only to pay the debts at issue, then he would have been guilty of larceny by conversion because he would have had possession of the money only for the purpose of giving it to these creditors, but used it for other purposes. The defendant, though in actual possession of the money, never would have obtained legal title to the money under those facts because he could not do with it as he wished, a limitation that generally does not exist for title owners of property.

> When [this Court in *People v O'Shea*, 149 Mich App 268; 385 NW2d 768 (1986)] revisited this "specific or identical moneys" concept first outlined in *Bayer* and then continued in *Christenson*, it concluded that the term could not be interpreted so narrowly that it would preclude virtually any prosecution under MCL 750.362. Acknowledging the fungible nature of money, *O'Shea* clarified that "[t]he 'specific money' language in *Christenson* and *Bayer* should be read to mean the specific amount of money to make it identifiable as opposed to the identical money." In other words, the money's original owner need not intend to have the actual bills, coins, or negotiable instrument returned in case the transaction, regardless of its nature, fails. Rather, *the money's original owner need only entrust the defendant with the money expecting that the same amount be returned in case the transaction fails in order to retain legal title to the money though relinquishing possession.* [Citations omitted, emphasis added.]

Here, there is sufficient evidence to support that Clowers entrusted defendant with the money expecting that the same amount be returned in case the transaction failed, and thus retained legal title to the money though relinquishing possession. Clowers and defendant testified, and a trial exhibit showed, that there was an estimate of $8,500 for installation of a furnace, air-conditioning system, ductwork, and an underground gas line in a three-day period, and that Clowers paid a $5,500 deposit to defendant on August 23, 2018. According to Clowers, the work was to be performed August 27 through August 29, 2018, but, despite repeated communications between defendant and Clowers that defendant was expected on site, the first activity on the project was when defendant and his employee installed a temporary air conditioner on August 29. Clowers testified that he continued to ask defendant when he would arrive to work, but all that was

accomplished over the next two days was that defendant's employee helped a carpenter dismantle some concrete because he was bored. Clowers further testified that defendant and his employee began digging a trench on September 1, 2018, that the employee continued on the next day until the employee damaged a sewer pipe, and that defendant promised to complete the project the next day.

There is no dispute that Clowers and defendant exchanged text messages on September 3, 2018. In those messages, Clowers told defendant to cancel the project, and to refund the money or deliver the equipment his deposit was intended to purchase, because of damage to the property, defendant's not coming to work and lack of honesty. Defendant responded by saying that he would attempt to complete the project. As noted, Clowers testified that defendant arrived at the site on September 4, 2023, promising to obtain and deliver the equipment that had been purchased, but instead both defendant and Clowers went to the police and filed reports. Clowers further testified that, the following day, defendant collected his trenching machine and promised to return to reimburse Clowers. According to Clowers, the two again communicated on September 7, 2018, with defendant promising to bring the furnace and air conditioner, and again on September 10, with defendant promising to have the furnace delivered and installed, but Clowers recovered only two pieces of ductwork and two pipes.

On these facts, the trial court could reasonably find beyond a reasonable doubt that Clowers intended to retain title to the deposit he paid to defendant until the equipment that the deposit was paid to purchase was installed. Clowers thus entrusted his money to defendant's possession, but retained title to the money until defendant completed his obligation. Because defendant did not fulfill his obligation, despite frequent communication from Clowers demanding progress, and kept the deposit entrusted to him, there was evidence to support the conclusion that he intended to deprive Clowers permanently of that property.

Accordingly, viewing the evidence in a light most favorable to the prosecution, the trial court reasonably concluded beyond a reasonable doubt that defendant intended to convert the deposit money for his own use. Therefore, the trial court did not clearly err when it found that there was sufficient evidence to convict defendant of larceny by conversion. Because there was sufficient evidence to support defendant's conviction, his due-process rights were not violated. See *People v Breck*, 230 Mich App 450, 456; 584 NW2d 602 (1998).

## III. SPEEDY TRIAL

Defendant next argues that the trial court violated his right to a speedy trial. We disagree.

In order to preserve this issue for appeal, the defendant must make a formal demand for a speedy trial on the record. *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999). In this case, defendant did not formally demand a speedy trial at any time in the trial court. Thus, this issue was not preserved for appeal. Unpreserved claims are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). When there is plain error, reversal is warranted only if the error resulted in the conviction of an innocent defendant, or if "the error seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence." *Id.*

Both the United States and Michigan Constitutions guarantee a "speedy and public trial" for a criminal defendant, which, in Michigan, is enforced by "statute and by court rule." *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006), citing US Const, Am VI; Const 1963, art 1, § 20; MCL 768.1; MCR 6.004(A). The purpose of the speedy-trial guarantee is to " 'minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.' " *People v Sierb*, 456 Mich 519, 531; 581 NW2d 219 (1998), quoting *United States v MacDonald*, 456 US 1, 8; 102 S Ct 1497; 71 L Ed 2d 696 (1982). To determine whether a defendant has been denied the right to a speedy trial, a court should balance the four factors set forth in *Barker v Wingo*, 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972): " '(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice the defendant.' " *Cain*, 238 Mich App at 112; 605 NW2d 28 (1999), quoting *Williams*, 475 Mich at 261-262.

Addressing the first factor, "[t]he time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *Williams*, 475 Mich at 261. In this case, the record includes no document providing defendant's arrest date; however, according to the register of actions, defendant was arraigned on March 22, 2019, and his trial began on January 12, 2022. Therefore, the length of delay in this case was nearly 34 months. It is presumed that a defendant is prejudiced after a delay of 18 months, upon which "the burden shifts to the prosecution to show that there was no injury," and this involves "an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Williams*, 475 Mich at 262 (quotation marks and citation omitted). The significant pretrial delay in this case was long enough to presume that defendant was prejudiced, even though that presumption is not dispositive of defendant's claim. See *Cain*, 238 Mich App at 112-113 (explaining that "[t]he length of delay is not determinative of a speedy trial claim") (Quotation marks and citation omitted.)

Turning to the second factor, reasons given for the delay, defendant notes that his trial was initially scheduled for January 14, 2020, about 10 months after his arrest, but was rescheduled to March 2020 by agreement of the parties. The parties agreed to an adjournment so that defendant could retain new counsel, and also try to resolve both the instant case, and another pending case, through negotiation. During the 10-month delay from the date of defendant's arrest to the original date set for trial, defendant's pretrial was adjourned from August 5, 2019 to September 12, 2019 for plea negotiations and for defendant to come up with restitution. The record indicates that the remaining nine months of delay were due to docket congestion and other administrative reasons inherent in the court system, which are attributable to the prosecution. However, even if docket congestion and other administrative delays "are technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *People v Gilmore*, 222 Mich App 442, 460; 564 NW2d 158, 167 (1997) (quotation marks and citation omitted). The two months between January 2020 and March 2020 that defendant used to retain new counsel and negotiate a plea deal can be attributed to defendant.

On March 3, 2020, instead of proceeding to trial, this case was remanded to the district court for a preliminary examination, which defendant's original attorney had waived, but that proceeding could not be held until August 12, 2021, due to the COVID-19 pandemic. That represents another 17-month delay. Following the preliminary examination, an arraignment was

scheduled for August 30, 2021, but during that proceeding, the trial court adjourned the matter 30 days to allow defendant's counsel to obtain the preliminary examination transcript. A pretrial was scheduled for October 25, 2021, which was another two month delay, with one month attributable to defendant for the transcript request and one month attributable to docket congestion. The parties then agreed to adjourn the pretrial to November 4, 2021, because defendant filed a motion to quash. On that date, defendant chose to withdraw his motion to quash and trial was scheduled for December 14, 2021. Trial was adjourned to January 2022 at defendant's request because he was sick on the date originally scheduled for trial. Defendant is responsible for these additional three months of delay.

The record thus indicates that the largest portion of the delay was for the period of inactivity between March 2020 and August 2021, 17 months, which coincided with restrictions related to the COVID-19 pandemic. In *United States v Smith*, 494 F Supp 3d 772, 783 (ED Cal, 2020), the federal district court held that the "emergency health measures to limit the spread of COVID-19" responsible for a delay in the defendant's trial did not "weigh against the Government" because "the Court's inability to safely conduct a jury trial is a good-faith and reasonable justification for the delay." In *People v Witkoski*, 341 Mich App 54, 60; 988 NW2d 790 (2022), this Court held in the context of the 180-day rule that delays primarily resulting from our Supreme Court's decision to suspend jury trials in response to the COVID-19 pandemic were not attributable to either party. The reasoning of *Witkoski* is equally applicable when considering the effect of that delay on the constitutional right to speedy trial, in that the directives of our Supreme Court must be followed by the lower courts, and therefore the prosecution should not be penalized by them.

Based on the foregoing, in total, 10 months of delay are attributable to the prosecution, and seven months of delay are attributable to defendant. The prosecution was not responsible for the delays resulting from (1) defendant's request for time to consider plea options, (2) defendant's decision to hire new counsel and hold a preliminary examination, (3) defendant's request for a transcript of the preliminary examination, (4) defendant's filing and withdrawal of a motion to quash, and (5) defendant being sick for the originally scheduled trial date. Periods of delay requested by defendant or otherwise attributable to defendant weigh against him in the balancing analysis. *Cain*, 238 Mich App at 113. The prosecution also could not be penalized for the 17-month delay caused by COVID-19 safety protocols. The remaining 10-month delay attributable to the prosecution due to docket congestion and administrative reasons weighs against the prosecution, but is "given a neutral tint" and "assigned only minimal weight." *Williams*, 475 Mich at 263. Accordingly, this factor weighs against the prosecution, but only minimally.

The third factor is the defendant's assertion of his right to a speedy trial. Defendant never asserted his right to a speedy trial, so the trial court had no reason to comment on the matter or place on the record the reasons for delay. "Whether and how a defendant asserts his right is closely related to the other factors we have mentioned." *Barker*, 407 US at 531. This factor "is entitled to strong evidentiary weight" because "[t]he more serious the deprivation, the more likely a defendant is to complain." *Id*. Defendant's failure to assert his right to a speedy trial weighs against finding that his right to a speedy trial was violated.

The fourth and final factor in a speedy trial analysis is whether defendant suffered prejudice as a result of the delay and is critical to the analysis. *Cain*, 238 Mich App at 112. Because prejudice to defendant is presumed with the delay greater than 18 months, "the prosecution must show that no injury occurred." *People v Rivera*, 301 Mich App 188, 193; 835 NW2d 464 (2013).

"There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to the defense." *Williams*, 475 Mich at 264 (quotation marks and citation omitted). Prejudice to the person includes "oppressive pretrial incarceration" as well as "anxiety and concern of the accused." *Barker*, 407 US at 532. "However, anxiety, alone, is insufficient to establish a violation of defendant's right to a speedy trial." *People v Gilmore*, 222 Mich App 442, 462; 564 NW2d 158 (1997). "Prejudice to the defense is the more serious concern, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Williams*, 475 Mich at 264 (quotation marks and citations omitted).

With regard to prejudice to defendant's person, the two-days' jail credit noted in defendant's judgment of sentence indicates that defendant spent minimal time in custody between his arrest and trial. This Court has held that a defendant who has not been incarcerated during a postarrest delay before trial has not endured prejudice to the person. *Gilmore*, 222 Mich App at 462; *Wickham*, 200 Mich App 106, 112. Defendant states that the prejudice he suffered took the form of "the disruption of life caused by his arrest and the presence of unresolved criminal charges" that he endured, but he does not specify any such disruptions. Defendant also complains of general anxiety due to the delay, but, as explained, "anxiety, alone, is insufficient to establish a violation of defendant's right to a speedy trial." *Gilmore*, 222 Mich App at 462.

Turning to "the most serious inquiry"—prejudice to the defense—we consider whether the delay has impaired the defendant's defense. *Simpson*, 207 Mich App at 564. In assessing prejudice to the defense, we do not look at how the prosecutor's case was improved during the delay, but to whether the defendant's defense was degraded." *People v Holtzer*, 255 Mich App 478, 494; 660 NW2d 405 (2003). The prosecution contends that, based on the record, there is nothing to support that defendant's defense was degraded as a result of the delay. Having reviewed the record, we agree that it does not reveal any apparent disadvantage to defendant caused by the delay. Moreover, defendant does not explain how his defense was degraded by the delay; he does not assert any loss of witnesses or evidence, or claim that his ability to adequately prepare or present his defense was prejudiced by the delay. On this record, we conclude that the prosecution sufficiently showed that defendant did not suffer any prejudice as a result of the delay in this case.

In sum, of the four *Barker* factors, the first factor supports that defendant's right to a speedy trial was violated, but "[t]he length of delay is not determinative of a speedy trial claim." *Cain*, 238 Mich App at 112-113. The second factor, reasons for the delay, also supports that defendant's speedy trial right was violated, but only minimally. The other two factors weighed against defendant's claim. Further, the prosecution overcame the presumption of prejudice resulting from the delay. Accordingly, balancing the four *Barker* factors, we find no violation of defendant's right to a speedy trial.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh
/s/ Jane E. Markey